**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ERIE CPR, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 18-124 Erie |
| | ) | |
| v. | ) | District Judge Susan Paradise Baxter |
| | ) | |
| PA DEPARTMENT OF | ) | |
| TRANSPORTATION, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.      Introduction

This civil action concerns the planned demolition of the East Avenue Bridge, which is owned by the City of Erie and commonly known as the "McBride Viaduct."  Compl. ¶¶23, 29, Doc. 1.  The case was commenced on April 30, 2018 by Plaintiffs Erie CPR[1] and Erie CPR members Beary Clark, Harry Euell, Michael Keys, Judy Lynch, Minister Luchetta Manus, Reverend Charles Mock,[2] Cynthia Muhammad, Noel Remigio, Abdulla Washington, Adam Trott, Lisa Austin, and Taquanta Gray (collectively, "Plaintiffs").  In their complaint, Plaintiffs request the entry of an order enjoining the Viaduct's removal and granting Plaintiffs a public hearing for the purpose of challenging the demolition plan.  To that end, Plaintiffs have filed a motion for preliminary injunction (ECF 3).

---

[1] Erie CPR is an unincorporated community organization composed of members from the City of Erie and Erie County.  Compl. ¶¶5-17, ECF No. 1.

[2] The claims of Reverend Charles Mock were voluntarily dismissed on May 11, 2018.  (ECF No. 8.).

In June and July 2018, following a delay in service of the Complaint, the "City Defendants" – i.e., the City of Erie, Pennsylvania (at times herein, the "City"), Erie Mayor Joseph Schember ("Schember"), and the City Council of Erie (the "City Council") -- and the "State Defendants" – i.e., the Pennsylvania Department of Transportation ("PennDOT"), the Pennsylvania Public Utilities Commission ("PA PUC" or the "Commission") -- filed their respective motions to dismiss the Complaint (ECF Nos. 21 and 29). Plaintiffs then sought, and received, an extension of time for purposes of filing their brief in opposition to the State Defendants' motions to dismiss, which was submitted on August 2, 2018 (ECF 35).

On September 18, 2018, the undersigned was assigned this case, following appointment as a United States District Judge. The Court's initial intent, particularly upon learning of the City's imminent demolition plans, was to schedule a hearing on the preliminary injunction. To that end, the Court held several telephonic status calls to discuss the procedural posture of the case and the practical logistics for scheduling either a preliminary injunction hearing or a final hearing on the merits. (ECF Nos. 38, 40, 41.) In the meantime, however, because the pending motions to dismiss were potentially dispositive and could moot the issue of injunctive relief, the Court undertook a careful and thorough review of the pleadings in light of Defendants' pending Rule 12(b)(6) motions. The Court also carefully considered which materials outside of the pleadings could be appropriately considered under Rule 12(b)(6) without the need for converting the Defendants' motion to a Rule 56 motion and thereby creating further delay.

The gravamen of the Complaint is that the City should maintain the Viaduct for continued pedestrian and bicycle use, so as to maintain connectivity between certain Eastside communities and provide what Plaintiffs consider to be a safer and preferable corridor of travel. Plaintiffs fault the City and State Defendants for engaging in a decision-making process that, in

their view, involved insufficient outreach to the affected community members. As a result, Plaintiffs maintain, the Defendants failed to understand the importance and utility of the Viaduct as a corridor for non-vehicular traffic. Plaintiffs also fault the Defendants for an alleged lack of transparency which, they claim, precluded interested citizens and organizations like Erie CPR from having a full and fair opportunity to present a case for continued use of the Viaduct as a corridor for walkers and bicyclists. At bottom, Plaintiffs seek an order from this Court that would require the Defendants to abandon their demolition plans and hold a hearing at which Plaintiffs can state their case for maintaining the Viaduct and the decision can be considered anew. In the course of its analysis, the Court concluded that the Plaintiffs' claims do not establish a basis for the relief they are seeking. Accordingly, for the reasons stated herein, Defendants' motions to dismiss the complaint will be granted.

## II.  Standard of Review

Defendants' motions are predicated on Rule 12(b)(6) of the Federal Rules of Civil Procedure. "'When considering a Rule 12(b)(6) motion, we accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Wayne Land & Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 526–27 (3d Cir. 2018) (internal quotation marks and citations omitted). In applying this standard, Court "need not accept as true 'legal conclusions' or '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements. . . .'" *Wilson v. City of Phila.*, 415 F. App'x 434, 436 (3d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (alteration and ellipsis in the original); *see Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Similarly, the

Court need not accept "unwarranted inferences." *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 184 (3d Cir. 2000) (internal quotation marks and citation omitted).

In order to survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing Twombly, 550 U.S. at 556). The plaintiff must tender more than mere "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In conducting a Rule 12(b)(6) analysis, the Court may consider 'only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents.'" *Wayne Land & Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 526–27 (3d Cir. 2018). (internal quotation marks and citations omitted) (alteration in the original). In the context of this case, the Court will consider: (1) the Complaint, (2) certain judicially-noticeable facts, (3) the "Purpose and Need Report" and the "Alternative Analysis Report" and related materials published by L.R. Kimball as part of the McBride Viaduct "Feasibility Study," *see* http://www.mcbrideviaduct.com/files/McBride_Viaduct-2012_P_N_Report.pdf and http://www.mcbrideviaduct.com/files/McBride_Viaduct_Feasbility_Study-Alternatives_Analysis_Report_2014.pdf;[3] (4) the Secretarial Letter issued by the PA PUC on

---

[3] The Court will consider these documents, both of which are publicly available, because: (i) the Feasibility Study and related materials are referenced repeatedly in Plaintiffs' Complaint, (ii) Plaintiffs purport to characterize the Feasibility Study as flawed and inadequate but failed to append a copy of the aforementioned Reports or related documents to the Complaint, and (iii) the Feasibility Study serves, in part, as the basis of Plaintiffs' legal claims.

February 17, 2017 (ECF No. 21-1); (5) the Opinion and Order entered by the PA PUC on July 18, 2017 (ECF 21-2); and (6) the Secretarial Letter issued by the PA PUC on December 20, 2017 (ECF 21-3).[4]

### III.     Factual and Procedural Background

A. <u>Background Facts</u>

The "McBride Viaduct" (at times hereafter, the "Viaduct") is a 1,170-foot bridge that extends south from East 12th Street in the City of Erie to East 19th Street.  Compl. ¶30.  It spans the CSX and Norfolk Southern Railroad tracks, which lie beneath to the East and West.  *Id.* Originally constructed in 1938, the Viaduct is named for Monsignor Lawrence McBride, who was so moved by the death of a child crossing the railroad tracks that he lobbied for construction of a bridge over the railroad tracks in order save lives.  *Id.* ¶23.

The land use under the Viaduct and along the nearby Bayfront Connector is industrial and zoned manufacturing.  Compl. ¶37.  The surrounding areas include commercial buildings, recreation sites, places of worship, and residential structures – including public housing communities and scattered Section 8 dwellings.  *Id.*  The neighborhoods surrounding the Viaduct are ethnically mixed and its inhabitants tend to have lower incomes.  Compl. ¶36.  A significant number of the Hispanic residents of the McBride Viaduct neighborhood and adjoining census tracts have limited proficiency in the English language.  *Id.*

In 2009, an independent engineering firm inspected the Viaduct and confirmed that it had experienced "major deterioration," requiring "significant repair work" in order to maintain its

---

Moreover, Plaintiffs' counsel conceded at the October 3, 2018 status conference that the Feasibility Study is integral to the Plaintiffs' claims.

[4] The Court will consider these PA PUC documents because, like the McBride Feasibility Study materials, no challenge has been raised concerning their authenticity, and they are integral to Plaintiffs' claims.

designated carrying capacity. Purpose and Need Report, http://www.mcbrideviaduct.com/files/ McBride_Viaduct-2012_P_N_Report.pdf (at times hereafter, "P&N Report") at 1. The following year, the City closed the Viaduct to vehicular traffic for public safety reasons. *Id.* at 2; Alternative Analysis Report, http://www.mcbrideviaduct.com/files/ McBride_Viaduct_Feasbility_Study-Alternatives_Analysis_Report_2014.pdf (at times hereafter, "A.A. Report") at 1. A biennial inspection of the Viaduct was conducted in 2011 in accordance with the National Bridge Inspection Standards. P&N Report at 3. This inspection revealed that the structure was both "structurally deficient" and "functionally obsolete" due to the poor rating of its structural elements and their inability to meet current design standards. *Id.*; A.A. Report at 1. Since being closed off to vehicular traffic, the Viaduct has been used exclusively by pedestrians and bicyclists. P&N Report at 9; A.A. Report at 1.

In November 2011, CDI Infrastructure, LLC d/b/a L.R. Kimball ("L.R. Kimball") -- an architectural, engineering, and communications technology company -- was retained to conduct an Alternatives Analysis Report for the City and PennDOT as part of the "McBride Viaduct Feasibility Study." P&N Report at 3. L.R. Kimball published its 125-page Alternative Analysis Report, along with an 818-page appendix,[5] in April 2014.

According to the Alternative Analysis Report, the stated purpose of the "McBride Viaduct Project" is "to provide a means for safe, efficient, and feasible access to the lower and central eastside neighborhoods and businesses in the City of Erie." A.A. Report at 1. The Report outlined various "project needs," which included the following considerations:

- The McBride Viaduct is considered structurally deficient and functionally obsolete and has been closed since June 2, 2010.

_____

[5] *See* http://www.mcbrideviaduct.com/files/McBride_Viaduct_Feasibility_Study-Alternatives_Analysis_Appendices_2014.pdf.

- The typical Viaduct traffic utilizes posted detours and alternative routes, causing an increase in travel time for the general public.

- The existing roadway network surrounding the McBride Viaduct is not adequately designed to accommodate the increased traffic especially for large trucks.

- Connectivity issues exist for the adjacent roadways within the project area.

- Missing links in pedestrian and cyclist connectivity exist within the surrounding vicinity.

- Existing and future traffic delays exist within the project area.

A.A. Report at 1.

The Alternatives Analysis Report analyzed eleven different options with the stated goal of finding the one that would best meet the above-referenced project needs. A.A. Report at 2, 68-96. Among the alternatives considered were: demolishing the Viaduct, repairing the Viaduct, replacing the Viaduct, and constructing a new pedestrian bridge at the Viaduct's current location. *Id.*

As set forth in the Report, the "preferred alternative" recommended by L.R. Kimball was the "Buffalo Road Interchange Alternative," which involved (among other things): installation of "a new interchange at the Bayfront connector and Buffalo Road," "demolition of the existing viaduct," and construction of certain "pedestrian safety improvements along the CSX mainline tracks and the Bayfront Connector." A.A. Report at 79. According to the Report, the "Buffalo Road Interchange Alternative" met all of the aforementioned "project needs" and provided the following advantages, *to wit*:

> \- This alternative includes an additional east-west pedestrian crossing on the Bayfront Connector via the addition of a traffic control signal on the Bayfront Connector at the Buffalo Road Interchange, as well as the inclusion of the improvements associated with the Bayfront connector At-Grade crossing (Improvement #6), giving pedestrians "green time" to cross the Bayfront Connector;

- This alternative would have fewer environmental impacts than the Bridge Replacement Alternative in terms of hazardous materials;

- The traffic analysis provides acceptable traffic results in terms of delay (congestion) and queuing (vehicle tracking). With traffic signal retiming and other minor improvements to the adjacent transportation system, this alternative yields no major traffic increases and meets the threshold levels for PennDOT;

- This alternative provides a direct connection from Buffalo Road to the Bayfront Connector and eliminates the current detour route as well as decreasing travel time from existing conditions (closed viaduct) and providing comparable travel times to the rehabilitation and replacement alternatives;

- This direct connection to the Bayfront Connector may provide some for [sic] future development within the new interchange vicinity;

- This alternative has a total construction and design cost of $8.7 million, the lowest of the three final alternatives; and

- The life cycle cost analysis ranks this alternative number one among the three final alternatives[.]

A.A. Report at 95-96.

Because the project area includes minority and low income populations, L.R. Kimball included an environmental justice analysis as part of its study. A.A. Report at 2, 29-30. As stated in the Report's "Executive Summary":

Extensive outreach efforts have been utilized to gather input from the community. An assessment of the project was conducted to determine if the potential for disproportionately high and adverse effects upon these populations would exist, given the identified alternatives. It was determined that all viable alternatives include safe pedestrian/bicycle connections for both north/south and east/west travel; connections for vehicles to all areas within and adjacent to the study area with reasonable travel times; minimal environmental impact; no displacements, no interruption to existing transit services, and no effect to emergency response times. Based on this information, *the McBride Viaduct alternatives will not cause disproportionately high and adverse effects on any minority or low income populations* in accordance with the provisions of E.O. 12898, DOT Order 5610.2(a) and FHWA Order 6640.23A.

A.A. Report at 2 (emphasis in the original). On August 1, 2013, the Federal Highway

Administration officially approved L.R. Kimball's Environmental Justice Report. *Id.* at 30.

With respect to the issue of pedestrian and bicycle safety, the Report notes that:

[t]he current Bayfront Bikeway configuration provides access for pedestrians and bicycles along the eastbound side of the Bayfront Connector and to Buffalo Road. The Buffalo Road Interchange Alternative will provide sidewalks and connectivity links to keep access to the Bayfront Bikeway. The 10-foot wide Bayfront Bikeway is designed adjacent to the Bayfront Connector and Buffalo Connector Road with a 6-foot buffer area separating the curb. Pedestrian cross walks are anticipated adjacent to the Buffalo Connector Road and Bayfront Connector, as well as the intersection of Buffalo Connector Road, Buffalo Road, and Pennsylvania Avenue (all approaches). ADA compliant curb ramps will be installed at all applicable intersection approaches and will be designed in accordance with Public Rights-Of-Way Accessibility guidelines (PROWAG).

A.A. Report at 109.

As part of the project development process, a "Public Involvement Plan" was established

with the stated goal of "ensur[ing] [that] the community's concerns, interests and advice would

be taken into consideration . . . ." A. A. Report at 4. These efforts included:

- the creation of a project website that included information about the project, the schedule of planned improvements, and information on how to get involved;

- the publication of newsletters that provided information about the project alternatives under consideration and the preferred alternative;

- a January 30, 2012 meeting for the purpose of providing a general project overview and discussing the project schedule with public safety personnel and officials;

- the scheduling of additional public meetings to discuss ongoing issues with the project and receive comments;

- the formation of a Citizens Action Committee ("CAC") to represent the broader public and provide insight on issues that affect the community as a whole; and

- the scheduling of four CAC meetings between April 2012 and July 2013.

*Id.* at 4, 44-48.

In December 2016, the City applied to PennDOT and PAPUC for permits to demolish the McBride Viaduct. Compl. ¶158. According to Plaintiffs, neither the City nor PennDOT published formal notice of the City's application to PAPUC for demolition of the Viaduct. *Id.* ¶159.

In a Secretarial Letter dated February 17, 2017, the PA PUC approved the City's request, finding that "the abolition of the crossing is necessary and proper for the service, accommodation, convenience or safety of the public." ECF No. 21-1 at 2; *see* Compl. ¶158. The Commission directed the City to prepare and submit demolition plans within the following sixty days. ECF No. 21-2 at 2.

Erie CPR, through Plaintiff Adam Trott, then filed a petition for reconsideration with PA PUC on March 6, 2017. Compl. ¶159. By Opinion and Order entered on July 18, 2017, the PUC denied the petition. ECF No. 21-2. In its Opinion, the PA PUC noted, in relevant part, the following:

> The Petitioner argues that Erie's reasoning for the abolition of the subject crossing was based entirely upon the recommendations and results of the Feasibility Study,[6] which the Petitioner alleges, is flawed because it failed to consider the alternative of rehabilitating the crossing for use as a "pedestrian-only bridge." According to the Petitioner, the Feasibility Study failed to properly evaluate the McBride Viaduct for pedestrian-only usage because it wrongly limits Viaduct pedestrian use to only the bridge sidewalks, and not to the entire roadway which would be available for use by pedestrians. In citing to several exhibits from the Feasibility Study, the Petitioner argues that the Feasibility Study failed to include an impact assessment of hazards for pedestrians with respect to noise, debris, and the cumulative impact of those pedestrians using the route at least two times per day. In the Petitioner's view, if the alternative of using the crossing as a pedestrian-only bridge is fully considered, it would significantly alter several key finding of the Feasibility Study, most notably the project cost, which the Petitioner states was a major consideration in the Feasibility Study's final recommendation. Petition at 3-6.

> ***

---

[6] In referring to the "Feasibility Study," it appears that Erie CPR and/or Trott were primarily referencing L.R. Kimball's Alternative Analysis Report.

In its Answer to the Petition, Erie refutes the Petitioner's assertion that the Feasibility Study failed to properly consider the alternative of using the crossing as a pedestrian-only bridge. According to Erie, the Feasibility study examined eleven alternatives, including the alternative championed by the Petitioner, but found that the cost of rehabilitation of the bridge for pedestrian-only use was not materially different from usage of the bridge by vehicles. As a result, Erie submits that the Complainant's suggested rehabilitation alternative provides no advantages because it would serve fewer needs, thereby supporting the validity of the feasibility Study's recommendation for abolition of the crossing. In addition, Erie contends that the proposed project has been the topic of study and of public meetings for a number of years and the Petitioner has failed to provide a valid reason for overturning the Commission's determination that the project can be approved on an expedited basis. Erie Answer at 2-3.

. . . . Erie submits that it has engaged in an exhaustive Feasibility Study, which was approved by PennDOT and the Federal Highway Administration, and held three public meetings and four citizen advisory committee meetings on the subject. Erie Answer at 2.

***

(ECF No. 21-2.) The PA PUC ultimately denied the petition for reconsideration on the procedural ground that neither Erie CPR nor Trott had intervened as parties of record to the proceedings. (*Id.*) The Commission noted that "[t]he [City's] Application [to abolish the Viaduct] was served on Mr. Trott as someone who may be interested in this proceeding, but neither he nor ErieCPR filed a protest or any other document which would indicate that he or ErieCPR wished to become a Party." (*Id.*) "[Mr. Trott's] protest," the Commission noted, "should have been filed to the Application prior to the issuance of the [February 17, 2017] Secretarial Letter." (*Id.* at 9 n.1.)

The PA PUC's Opinion and Order indicates that a public meeting was held on July 12, 2017. (ECF No. 21-2 at 1.) On that date, the Commission adopted the aforementioned Opinion and Order, although it was not entered on the record until July 18, 2017. (ECF No. 21-2 at 10.)

On December 20, 2017, the PA PUC issued a second Secretarial Letter in which it formally approved the City's demolition plans for removal of the Viaduct. (ECF No. 21-3.) The

Court takes judicial notice of the fact that, during a public City Council meeting held on February 7, 2018, the Council passed a resolution that permitted Schember's administration to execute a $1.5 million contract for the purpose of demolishing the McBride Viaduct. *See* Official Minutes of City Council Meeting of Feb. 7, 2018, *http://www.erie.pa.us/Portals/0/Content/Council/2018/2018-02-07%20minutes.pdf; see also* Compl. ¶161. The City Council approved the demolition contract after tabling consideration of a motion, made by one of the Council's members, to hold a further public hearing on the matter. Compl. ¶161.

B. These Proceedings

After making a final, unsuccessful appeal, Compl. ¶161, Erie CPR and certain of its members commenced this civil action on April 30, 2018, with the filing of their three-count complaint. ECF No. 1. Count I of the Complaint asserts a claim for intentional race-based discrimination in violation of §601 of Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. §2000d (Compl. ¶162-165); Count II alleges that Defendants violated regulations set forth at 49 C.F.R. Part 21 and promulgated under §602 of Title VI, 42 U.S.C. §2000d-1 (Compl. ¶¶166-171); Count III asserts a claim for the alleged violation of Plaintiffs' equal protection rights in violation of the Fourteenth Amendment to the United States Constitution (Compl. ¶¶172-178).

*The Complaint*

The factual underpinnings of Plaintiffs' claims are set forth in various subsections of the Complaint. *See* Compl. ¶¶23-161.[7] In Subsection "A," Plaintiffs aver that the "Defendants

---

[7] The Court notes at the outset that the Complaint, though lengthy, is rife with allegations that are repetitive, vague, or conclusory. For example, Plaintiffs repeatedly aver throughout their Complaint that the Defendants acted unlawfully or with discriminatory intent. *See, e.g.*, Compl. ¶¶42, 49, 50, 51, 58-60, 86, 91, 104, 121, 147, 154-157,

knew the racial identity of the total population as well as the areas of racial and ethnic concentration for the City of Erie and the Census Tracts that are adjacent to the McBride Viaduct area." *Id.* ¶27. Plaintiffs allege, among other things, that the McBride Viaduct neighborhood and surrounding areas have a disproportionately greater concentration of industrial and waste-related facilities and that enforcement of "air quality, odor, noise, health, traffic, and other regulations at the McBride Viaduct has been ineffectual and inadequate for many years," resulting in severe blight and comparatively greater health hazards as compared to white neighborhoods. *Id.* ¶¶ 37-39.

In Subsection "B," Plaintiffs purport to set forth "Defendants [sic] Pattern of Intentional Discrimination Based Upon Race." Compl. at p. 9. Specifically, Plaintiffs claim that the "Defendants in 2014 proposed two structural-compensatory measures" -- *i.e.*, a pedestrian and bike crossing at East 19th Street and a sidewalk on the south side of East 12th Street – that "would have allowed citizen stakeholder pedestrians and bicyclists to a) more directly cross East and West over the Bayfront Connector and, b) to proceed East at East 12 Street without having to cross the highway intersection." Compl. ¶43. Three years later, however, a PennDOT official distributed McBride Viaduct documents from which these two measures had been omitted. *Id.* ¶44. Plaintiffs complain that the changes were made "without prior public notice or discussion at a public hearing." *Id.* ¶45. Elsewhere in Subsection "B," Plaintiffs aver that the City Defendants' failed to clean the McBride Viaduct's storm drains which fostered slow 'demolition

160-61. Such conclusory averments, however, are insufficient to state a valid §601 claim. *See Parkell v. Pierce*, No. CV 17-157-LPS, 2018 WL 3104406, at *3 (D. Del. June 22, 2018) (In conducting a Rule 12(b)(6) review, "[t]he Court is not obligated to accept as true 'bald assertions,' . . . 'unsupported conclusions and unwarranted inferences,' . . . or allegations that are "self-evidently false[.]") (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), and *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996)). Consistent with federal pleading standards, the Court has disregarded those aspects of the Complaint that involve restatements of the law or mere conclusory allegations about the alleged unlawfulness of Defendants' actions. The Court predicates its summary of Plaintiffs' claims upon the well-pled factual averments in the Complaint.

by neglect.'" Compl. ¶46. They claim (without elaboration), that the "City Defendants have regularly maintained and cleaned bridges in the white majority neighborhoods . . . but have not done so with the bridges in the predominantly African-American community." *Id.* 47. Plaintiffs further aver that the City's engineer "admitted during a 2018 television interview that he had been planning to demolish the McBride Viaduct for over a decade." *Id.* ¶48.

In Subsection "C" of the Complaint, and again in Subsection "L," Plaintiffs contend that the Defendants failed to notify the public concerning events relevant to the Viaduct project. Plaintiffs assert that "Defendants failed to provide public hearings regarding their selection of a preferred alternative to repairing the McBride Viaduct." Compl. ¶57. Concerning the proceedings before the PA PUC, Plaintiffs fault PennDOT and the City for failing to provide public notice of the City's application to PA PUC for permission to remove the Viaduct. *Id.* ¶¶57, 159. In addition, Plaintiffs fault the PA PUC for failing to notify the public, Erie CPR, or Mr. Trott of the July 12, 2017 meeting. *Id.* ¶¶57, 159. Plaintiffs characterize the PA PUC's July 12 meeting as a "secret, closed door carry-in agenda meeting," the purpose of which was to affirm the PUC's prior denial of Erie CPR's request for an appeal hearing. Compl. ¶159.

Subsection "D," is entitled "Disparate Treatment of White Community and Black Community and Bridges." Compl. at p. 12. Therein, Plaintiffs allege that "at least two bridge projects in the Defendant City's white communities, Frontier Park[8] and Glenwood Park, both majority white neighborhoods, received new, costly neighborhood bridges with federal financial assistance." *Id.* ¶61. More specifically, Plaintiffs aver that:

- "the Norman Way Bridge, located in the Glenwood park/Glenwood Heights area of Erie was replaced in 2013 with a new bridge that cost over one million dollars[,]" Compl. ¶62;

---

[8] Although the Complaint alludes to comparator bridge projects located in the Frontier Park area of the City, Plaintiff's averments acknowledge that each of the comparator bridges or roadways identified in the Complaint are located in Glenwood Park. *See* Compl. ¶¶62-64.

- "the Millcreek Drift Catcher Zoo Train Bridge, which is 100 years old, was rehabilitated in the Glenwood Park neighborhood with federal financial assistance[,]" *id*. ¶63;

- "[f]ederal transportation funding was spent to realign West 38th Street and Glenwood Park Avenue between Sassafras and Cherry Streets in or around 2014 in a majority white neighborhood." *Id*. ¶64.

Plaintiffs contrast the foregoing projects, which allegedly involved only "new construction," Compl. ¶72, with the teardown of the "Division Street railroad underpass," which – Plaintiffs claim -- had previously linked a portion of the City's eastside minority population to the Pieffer-Burleigh Elementary School. *Id*. ¶67. The demolition of the underpass occurred in connection with the City's Metropolitan Transit Authority garage and parking lot construction project. *Id*. With respect to the planned demolition of the McBride Viaduct, Plaintiffs fault the Defendants for "dismiss[ing] the potential bike-pedestrian-only use too early in the study without proper due diligence." *Id*. ¶69. By "assign[ing] the low standard threshold designation 'no build' alternative to the repair for vehicular use instead of repair for bike-pedestrian-only use," *id*. ¶70, Defendants allegedly "made the feasibility of the proposal to repair the viaduct much more arduous than it should have been." *Id*. ¶71.

Subsection "E" of the Complaint addresses the Defendants alleged "Fail[ure] to Develop and Conduct an Adequate and Legally Sufficient Environment Study." Compl. at 14. This grievance overlaps somewhat with Plaintiff's related complaint, in Subsection "K," that "Defendants PennDOT and City Failed to Properly Engage Improverished Citizen Stakeholders of the McBride Neighborhood." *Id*. at p. 22. The gravamen of Plaintiffs' grievances is that, from a procedural perspective, the Defendants failed to structure an "appropriate" and "transparent" public outreach program that would have more fully engaged social justice populations in the McBride area and thereby produced a more informed Feasibility Study.

Compl. ¶¶75, 123. On the one hand, Plaintiffs acknowledge that Defendants engaged in public notification and outreach efforts through the use of "mailings, newsletters, surveys, comment forma, and public input." *Id.* ¶98. However, Plaintiffs characterize these efforts as "very limited," *id.*, and they object that Defendants "failed to recognize the importance of on-site interviews of the actual impoverished users of the bridge to determine its value" to those users. *Id.* ¶74; *see id.* ¶130. Plaintiffs further claim that Defendants should have prepared "public involvement materials" in other languages, *Id.* ¶139, and should have utilized interpretative services, such as PennDOT's "INTERPRETALK" service, to ensure effective communication with non-English speaking citizens. *Id.* ¶¶141-43. As a result of these failures and Defendants' reliance on the Alternative Analysis Report as a public outreach tool, Defendants allegedly engaged less than 1,000 individual responses – or less than five percent (5%) of the 23,000 "citizen stakeholders" that reside within the one and a-half mile radius of the Viaduct. *Id.*¶¶ 126-127. According to Plaintiffs, this is less than half of the minimally acceptable response rate established by industry standards. *Id.* ¶¶128-29; *see id.* ¶73. Plaintiffs claim that Defendants acted contrary to PennDOT's "Project Level Environmental Justice Guidance" publication,[9] which "recognized that public involvement should be ongoing and should be designed to get all stakeholders activity involved in the process." *Id.* ¶¶136-138.

From a substantive standpoint, Plaintiffs object that the Defendants' use of the Feasibility Study materials "resulted in Defendants approving the demolition of the Viaduct without any calculation of an estimate to determine the cost of repairing the Viaduct for bike-pedestrian only use." Compl. ¶132; *see id.* ¶76. According to Plaintiffs, "ongoing maintenance" of the Viaduct will cost "only a few thousand dollars a year," *id.* ¶80, an amount which "can be raised and

---

[9] This document is publicly available at http://www.dot.state.pa.us/public/pubsforms/Publications/Pub%20746.pdf.

provided by an established non-profit agency through a 'P3' agreement the City and thus relieve the City of these smaller ongoing maintenance costs." *Id.* In addition, "[t]he federal financial assistance from FHWA and Defendant PennDOT for demolition of the McBride Viaduct can be reallocated to repair work on the bridge if the City Defendants decide to keep and repair the bridge in lieu of demolition." *Id.* ¶85. According to the Complaint, "[a] total of $1.26 million is available from PennDOT for diversion from demolition to repair the McBride Viaduct." *Id.* ¶87.

Repeatedly throughout their Complaint, Plaintiffs fault the Defendants' reliance on the Alternative Analysis Report as a basis for their decision to demolish the Viaduct. In Plaintiffs' view, the Report was incomplete because "it was prepared by traffic engineers[ ] and lacked input from any architects, urban planners, urban designers or landscape architects." *Id.* ¶134; *see id.* ¶¶78, 97. Plaintiffs further contend that:

> [t]he environmental review within the study failed to recognize the environmental impact that removing the bridge would have on the existing Viaduct users. Demolishing the bridge forces the current users . . . to relocate from their shorter, more peaceful and non-polluted route over the Viaduct to a much longer and more polluted and harrowing route alongside the four-lane arterial highway, Rt. 290, known as the Bayfront Connector. The alternative route is filled with noise, harmful particulate matter, and forces the walkers/bicyclists on the north end of the route to traverse to a very dangerous, "blind corner" intersection.

*Id.* ¶79.

In Subsection "F" Plaintiffs assert that "Despite Numerous Community Requests, Defendants Refused to Hold Public Hearings." Compl. at p 18. Plaintiffs' theory on this point is concisely summarized by the following allegations, found elsewhere in the Complaint:

> There has never been a full public hearing on this project. The demolition team has only conducted several public meetings and tightly controlled agendas, meeting protocols and messaging that was biased toward the plan for demolition. Between February 2012 and July 2013 Defendants held three [Citizen Advisory Committee] meetings and two public presentations. The process was slanted toward demolition from the start. Defendants went through the steps of holding a meeting, but never sincerely investigated what it would take to repurpose the bridge. Ultimately, Defendants dismissed repurposing the bridge way too early.

Compl. ¶89. Plaintiffs concede that a public meeting was held on February 27, 2012 "to introduce and provide information on the *McBride Viaduct Feasibility Study* to the general public, meet the project team, seek feedback on issues and to solicit nominations for the Citizen Advisory Committee ("CAC")." *Id.* ¶90. Plaintiffs contend, however, that "[n]otes from the meeting . . . indicate that the public's role was simply to provide input and allow for public opinion to be integrated into the development process." *Id.* Plaintiffs object to the fact that the City Defendants: (i) never employed a city planner in connection with the Feasibility Study, *id.* ¶97, (ii) did not record or use a stenographer at any CAC meetings, public meetings, or "Public Safety & Government Officials meetings," relying instead on written minutes of those meetings, *id.* ¶¶99-100, and (iii) did not use interpreters or other forms of multilingual communication in connection with public meetings. *Id.* ¶¶102-04.

Plaintiffs' remaining subsections address the negative impacts that residents of the Viaduct area will allegedly experience as the result of the Viaduct's demolition. Plaintiffs aver that a loss of north-south connectivity will occur between the East Avenue business corridor and the "heavily used" Buffalo Road, Perry Plaza corridor. Compl. ¶¶105-06 (Subsection "G"). Plaintiffs further claim that neighborhood citizens will incur injury to their health because they will be "forced to walk a longer route (minimum 711 feet longer) which includes a harrowing 2000 feet walk alongside a four-lane arterial highway breathing in fumes and particulates from 14,000 daily cars, trucks and tractor trailers." *Id.* ¶¶107-112 (Subsection "H"). In addition, Plaintiffs will allegedly face increased dangers in the form of: (a) longer emergency response times; (b) a likelihood that pedestrians will breach barriers to utilize the at-grade shortcut over the railroad tracks; and (c) the need for pedestrians and bikers to cross a dangerous highway

intersection at East 12th Street and the Bayfront Highway where they will have to "dodge

vehicles turning right-on-red." *Id.*¶¶113-18 (Subsection "I").

To redress these grievances, Plaintiffs seek:

(1) an order declaring that the demolition approvals are "invalid and rescinded";

(2) an order declaring "that Defendants failed to comply with their own policies and procedures [for evaluating demolition approvals] and as a result have violated §601 of Title VI . . .";

(3) an order declaring "that Defendants failed to comply with §601 of Title VI . . . because Plaintiffs were never provided with any public hearing prior to the approval of the demolition";

(4) an order "requiring that Defendants show that each entity complied with §601 of Title VI . . . prior to approving the demolition";

(5) an order "requiring Defendants to develop a protocol for reviewing demolition applications in compliance with Title VI and to apply that protocol to conduct a valid analysis of the discriminatory adverse environmental effects that would be created by demolition of the McBride Viaduct"; and

(6) an order "declaring that Plaintiffs have rights under §601 of Title VI . . . to a public hearing to challenge the demolition of the McBride Viaduct before the demolition may proceed."

Compl. ¶2.

*The Pending Rule 12(b)(6) Motions*

On June 22, 2018, the City Defendants filed their motion to dismiss the complaint and a

supporting brief. Docs. 21 and 22. The City Defendants contend that the Complaint should be

dismissed in its entirety because: (i) Plaintiffs have failed to state a claim of intentional

discrimination for purposes of §601; (ii) no private cause of action exists under §602 of Title VI;

(iii) Plaintiffs have failed to plead intentional discrimination for purposes of their Equal

Protection Clause claim; and (iv) Schember and the City Council are entitled to legislative

immunity.

The State Defendants filed their motion to dismiss and supporting brief, Docs. 29 and 30, on July 13, 2018. The arguments of the Commonwealth Defendants largely mirror those of the City Defendants. Additionally, however, the Commonwealth Defendants contend that they are immune from suit in federal court relative to Count III of the Complaint.

Plaintiffs responded to the City Defendants' motion on July 6, 2018, Doc. 27. They filed their brief in opposition to the Commonwealth Defendants' motion, Doc. 35, on August 2, 2018. As noted, the undersigned received this case, by way of reassignment, on September 18, 2018. Having carefully reviewed the Complaint as well as the pending motions to dismiss and having determined that the relevant issues are sufficiently joined, this Court now renders its adjudication.

## IV. Discussion

### Count I of the Complaint

In Count I of the Complaint, Plaintiffs assert claims against PennDOT, PA PUC, and the City of Erie for racial discrimination in violation of § 601 of Title VI. This statute provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.*

It is well established that Title VI provides "a private cause of action for intentional discrimination only." *Pryor v. Nat'l Collegiate Ath. Ass'n*, 288 F.3d 548, 563 (3d. Cir. 2002); *see Alexander v. Sandoval,* 532 U.S. 275, 281–82 (2001). To state a viable claim under Title VI, a complaint must allege facts that would show: (1) the plaintiff belonged to a protected class; (2) he/she qualified for the benefit or program at issue; (3) he/she suffered an adverse action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.

*Innovative Polymer Techs., LLC v. Innovation Works, Inc*., No. CV 17-1385, 2018 WL 1701335, at *6 (W.D. Pa. Apr. 6, 2018); *Doe v. The Trustees of the Univ. of Pa.,* 270 F. Supp. 3d 799, 829 (E.D. Pa. 2017) (citing *Blunt v. Lower Merion School Dist*., 826 F. Supp. 2d 749, 758 (E. D. Pa. 2011), *aff'd,* 767 F.3d 247, 274–75 (3d Cir. 2014)).  The Third Circuit Court of Appeals has clarified that a defendant can be held liable under Title VI if the defendant knew of, and failed to correct, the intentional discrimination of a third party whose conduct was within the control of the defendant.  *See Blunt*, 767 F.3d at 273, 294; *Innovative Polymer Techs., LLC,* 2018 WL 1701335, at *6.

In moving to dismiss Count I, the State and City Defendants argue that the Complaint fails to sufficiently plead the requisite intentional discrimination.  Assuming for present purposes that Plaintiffs have sufficiently pled the other elements of their prima facie case,[10] the Court agrees with Defendants that the Complaint falls short of stating facts that could support a plausible inference of intentional race-based (or national origin-based) discrimination or deliberate indifference toward such discrimination.

Based on the record before the Court, there is no dispute that the McBride Viaduct was found to be "structurally deficient" and "functionally obsolete" due to the poor rating of its structural elements and their inability to meet current design standard.  *See* A.A. Report at 1.  As Plaintiffs acknowledge, the City's decision to demolish the Viaduct was predicated on the

---

[10] The Court notes that Plaintiffs Judy Lynch, Adam Trott, and Lisa Austin are alleged to be Caucasian individuals. Compl. ¶¶9, 15, 16.)  Consequently, they fail to satisfy the first element of their respective Title VI claims (*to wit,* membership in a protected class) to the extent they are suing in their own personal capacities on behalf of themselves.  *See Danihel v. Office of President of U.S.,* 616 F. App'x 467, 471 (3d Cir. June 9, 2015) ("[Plaintiff] has not alleged that he was harmed due to his membership in a Title VI class, and his claim therefore fails as a matter of law.").  For the same reason, these Plaintiffs cannot establish an injury-in-fact for purposes of demonstrating individual standing.  *See Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 561 (3d Cir. 2002) (observing that constitutional standing requires the pleading to show, among other things, that the plaintiff sustained a legally recognized injury).  To the extent Erie CPR has representational standing to sue on behalf of African-American and Hispanic "citizen stakeholders" who reside in the McBride Viaduct area, *see* Compl. ¶1, the Court assumes for present purposes that Erie CPR can satisfy the first three prima facie elements of its Title VI claim.

recommendations of L.R. Kimball, a third-party engineering firm. *See, e.g.,* Compl. ¶¶124, 125, 126, 127, 128, 129, 130, 132, 134. A review of the Alternative Analysis Report and supporting documentation shows that L.R. Kimball's recommendations were predicated on a highly detailed cost/benefit analysis of eleven different construction alternatives, which included options for repairing the Viaduct or replacing it. The Alternative Analysis Report concluded that the best overall option for satisfying the project's needs was demolition of the Viaduct, coupled with various improvements in the area of the Bayfront Connector and East 12th Street. Concerns about connectivity and bicycle/pedestrian safety were specifically addressed in the study, as were environmental justice issues. A.A. Report at 4, 27-30, 109. Significantly, the U.S. Department of Transportation's Highway Administration officially approved L.R. Kimball's environmental justice report in August 2013. *See* A.A. Report at 30. Although Plaintiffs take issue with the Report and refer to it at times as "biased" or "flawed," the Report is self-evidently race-neutral. Indeed, Plaintiffs do not contend that L.R. Kimball acted with racially discriminatory motives and nothing in the Report would support such an inference.

In order to prove intentional discrimination through the application of a facially neutral policy, a plaintiff must show that the relevant decisionmaker adopted the policy at issue "because of, not merely in spite of, its adverse effects upon an identifiable group." *Pryor,* 288 F.3d at 562 (internal quotation marks and citation omitted). Among the factors courts consider are "the historical background of the ... decision; [t]he specific sequence of events leading up to the challenged decision; [d]epartures from the normal procedural sequence; and [t]he legislative or administrative history, especially ... [any] contemporary statements by members of the decisionmaking body." *Id.* at 563 (internal quotation marks and citations omitted; alterations and ellipses in the original). "A mere awareness of the consequences of an otherwise neutral policy

will not suffice." *Id.*; *see S.H. ex rel. Durrell v. Lower Merion Sch. Dist.,* 729 F.3d 248, 265 (3d Cir. 2013) ("*Pryor's* holding that the mere fact of disparate impact is insufficient to sustain a Title VI challenge to a facially neutral policy remains good law."). Thus, Plaintiffs averments concerning the disparate impact or effect that demolition will have on minority communities are insufficient, by themselves, to support Plaintiffs' §601 claim. *See, e.g.* Compl. ¶1 (alleging "the demolition approvals have a discriminatory effect on the African-American and Hispanic plaintiffs who comprise 91% of the McBride Viaduct neighborhood"); *id.* ¶¶ 107-118 (alleging various hazards that neighborhood citizens will suffer as a result of the Viaduct's removal); *id* ¶146 ("A disproportionately high and adverse effect on minority and low-income populations means an adverse effect that is predominately borne by a minority population and/or a low-income population."); *id.* ¶147 (alleging that Defendants' allegedly discriminatory conduct will cause Plaintiffs and the minority population and/or low-income population appreciably more sever or greater suffering" than will be suffered by the "non-minority population and/or non-low-income population").

The remainder of Plaintiffs' well-pled averments fail to establish a plausible inference of intentional discrimination. Although Plaintiffs fault the City and PennDOT for relying on the Alternative Analysis Report, their own allegations suggest that, at most, Defendants displayed negligence rather than discriminatory intent. *See, e.g.,* Compl. ¶74 (alleging that Defendants "failed to recognize the importance of on-site interviews" of Viaduct users, which led to their "collective failure in appreciating and understanding the true value of the Viaduct to Plaintiffs and other citizen stakeholders"); *id.* ¶76 ("Defendants failed to prepare an estimate to repair the McBride Viaduct for bike-pedestrian-only use."); *id.* ¶78 (faulting the Alternative Analysis Report because it was "prepared by traffic engineers," and was therefore "too narrowly focused

on vehicular traffic to be considered a complete study"); *id.* ¶79 ("The environmental review within the study failed to recognize the environmental impact that removing the bridge would have on the existing Viaduct users."); *id.* ¶125 ("Defendants' use of the flawed and biased *McBride Viaduct Study* resulted in their dismissing the potential bike-pedestrian-only use too early in the study without proper diligence and then unlawfully assigning the 'no change' alternative to the repair for vehicular use."); *id.* ¶129 ("Defendants' use of the *McBride Viaduct Study* is below the industry standard acceptable minimum response rate of 20%, and is actually less than half the acceptable minimum standard."); *id.* ¶131 ("The *McBride Viaduct Study* recognized that the Viaduct neighborhood was an incredibly diverse and impoverished urban population, but Defendants failed to structure an appropriate public outreach plan that properly engaged the Viaduct [social justice population'. . .'"); *id.* ¶132 ("Defendants' use of the *McBride Viaduct Study* resulted in Defendants approving the demolition of the Viaduct without any calculation of an estimate to determine the cost of repairing the Viaduct for bike-pedestrian only use."); *id* ¶138 ("Defendants' public involvement was not ongoing throughout the planning process, and Defendants failed to make certain that all of the neighborhood stakeholders [were] actively involved at all stages of the McBride Viaduct project development."); *id.* ¶140 ("Defendants failed to utilize appropriate public involvement techniques to ensure effective communication with non-English speakers."); *id.* ¶148 ("Defendants failed to evaluate the environmental justice effects of the McBride Viaduct's demolition and address the transportation needs and concerns of the EJ populations in the plan or program.").

To the extent Plaintiffs allege that Defendants engaged in inadequate public outreach or operated with a lack of transparency, the well-pled facts – though credited -- must be viewed in the context of the documented measures that were undertaken by the Defendants. Among other

things, the Project Team (which included the City of Erie, PennDOT, and the Project Designer TranSystems)[11] created a public website, www.mcbrideviaduct.com, that went live in January 2012. *See* A.A. Report at 44. The website contained basic information about the project and the study area, provided graphic illustrations of the project site, included a link to L.R. Kimball's various reports and the supporting documentation, provided contact information concerning the project, and informed citizens on the various ways they could become involved. *Id*. at 44-45. In addition, the project team published four newsletters between 2012 and 2013 which provided updates on the various alternatives under consideration, including the ultimate "preferred alternative." *Id.* at 45.[12] In January 2012, the team held a "Public Safety and Officials Meeting" in order to provide a general overview of the project and to discuss the project schedule with public safety personnel and public officials. *Id.* at 45. The project team also held a series of public meetings between 2012 and 2013, which included presentations, question and answer sessions, and opportunities for participants to submit written comments. *See* A.A. Report at 46-47. In addition, a Citizens Advisory Committee ("CAC") was formed for the stated purpose of advising the project team "on issues that affect the community as a whole." *Id.* at 47. To that end, the CAC held four meetings between April 2012 and July 2013. *Id.* at 47-48. Included in the Alternative Analysis Report is an extensive summary of comments and concerns that were raised during public meetings and CAC meetings, along with L.R. Kimball's responses. *Id.* at 112-24. By way of example, the following comments and responses are noted:

> COMMENT: What is the response time for emergency vehicles with the McBride Viaduct demolished? How much time is now added and won't this be a major issue?

---

[11] *See* McBride Viaduct FAQs and Project Facts, http://www.mcbrideviaduct.com/faq.aspx.

[12] The Court takes judicial notice of the fact that a more recent newsletter, dated January 2017, is posted on the project website, at http://www.mcbrideviaduct.com/files/McBride_Viaduct_Jan_2017_Newsletter.pdf.

RESPONSE:  L.R. Kimball was notified by Tony Pol, fire Chief and Ray Welch, Assistant Fire Chief that the running tables have been revised to meet the required 4-minute response times.  The fire department engine houses have designated "first response" territories.  The first response company is required to have a 4-minute response time while the rest of the companies are required to arrive in less than 8 minutes, according to National Fire Protection Association standard 1710.  Based on discussions with the above individuals, and due to the corrective actions to the running tables, the demolishing of the viaduct would have minimal to no impact regarding emergency response times.

*** 

COMMENT:  Demolishing the McBride Viaduct will severely impact businesses in the area.

RESPONSE:  Businesses on the south end will greatly benefit with a new full access interchange linking Buffalo Road to the Bayfront Connector.  In addition, new business and development opportunities may be available for the south end of the viaduct with the addition of this new interchange.  For the business on the north end, they will still have access to the Bayfront Connector via East 12th Street, East 10th Street, and East 8th Street.  These options may provide other opportunities on these streets.  There will not be a negative impact for travel time in accessing the Bayfront Connector (and Interstate 79 and 90); and only a slight decrease in travel time to access destinations along Buffalo Road.

***

COMMENT:  Demolishing the structure will bring hardships to minor [sic] and low income individuals.

RESPONSE:  L.R. Kimball completed a comprehensive Environmental Justice Evaluation that studied the impacts of the alternatives to the low income and minority population.  It was concluded that the Buffalo Road Interchange Alternative has no adverse impact and actually provides some benefits for these residents by providing a full access interchange at Buffalo Road and the Bayfront Connector.

COMMENT:  The east side has been discriminated against when it comes to new infrastructure and transportation projects.

RESPONSE:  The Bayfront Connector was built in 2006, at a cost of $26 million, a very large project in Erie's eastside.  Because of this project, all east side residences and business now can access both I-79 and I-90 much more quickly and conveniently.

A.A. Report at 113-114.

In sum, the record shows that the Defendants undertook a substantial number of measures relative to public outreach during the decision-making process and provided multiple avenues for public input. Even if it could be inferred that Defendants were negligent in their efforts to canvass public opinion (a point on which this Court expresses no opinion), such an inference would be insufficient to state a Title VI claim. Accordingly, when viewed in the context of the undisputed facts, Plaintiffs' averments about lack of transparency and under-inclusiveness fail to support a plausible inference that the Defendants intentionally tried to shut minority citizens out of the project development process, or that they were aware of – but deliberately indifferent to – such efforts. *See Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009) (citation omitted) (discussing intentional discrimination in the context of the Rehabilitation Act and noting that "failure to act," for purposes of establishing deliberate indifference, is "a result of conduct that is more than negligent, and involves an element of deliberateness.") (quoting *Lovell v. Chandler*, 303 F.3d 1039, 1056 (9th Cir. 2002)); *Doe v. Bd. of Educ. of Cmty. High Sch. Dist.* 218, No. 16 CV 6646, 2017 WL 2672076, at *7 (N.D. Ill. June 19, 2017) ("'The standard of deliberate indifference sets a high bar for plaintiffs under Title VI and Title IX'; mere negligence is insufficient.") (quoting *Doe v. Galster*, 768 F.3d 611, 619 (7th Cir. 2014)).

With respect to environmental justice concerns specifically, the Complaint intimates that the City and PennDOT acted contrary to PennDOT's "Project Level Environmental Justice Guidance" publication, *see* Compl. ¶¶136-38, because the Defendants' efforts toward public involvement were "not ongoing throughout the planning process, and Defendants failed to make certain that all of the neighborhood stakeholders [were] actively involved at all stages of the McBride Viaduct project development." *Id.* ¶138. Plaintiffs did not append this document to

their Complaint, despite purporting to summarize its contents and citing it in support of their §601 claim.  However, the Court can take judicial notice of the fact that the document is publicly available and published on PennDOT's website, at:

http://www.dot.state.pa.us/public/pubsforms/Publications/Pub%20746.pdf.  Notably, the preface to the document contains the following disclaimer:

> This document is intended to assist the Pennsylvania Department of Transportation (PennDOT), its consultants, and other potential users in the completion of project level Environmental Justice analyses in compliance with Executive Order 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, and applicable current federal and state requirements for Federal-aid transportation projects on behalf of the Federal Highway Administration. *The procedures herein are not an adjudication or regulation. There is no intent on the part of PennDOT to give the procedures in this guidance weight or deference. This document establishes the framework within which PennDOT will exercise its administrative discretion in the future. PennDOT reserves the discretion to deviate from this guidance if circumstances warrant. This guidance is for informational purposes only; it is not regulatory*.

*Id.* at "Preface" (emphasis added).  Plaintiffs' allegations thus establish that, at most, PennDOT and the City failed to fully comply with PennDOT procedures that PennDOT itself did not consider to be either binding or definitive with respect to any given transportation project.  It is also self-evident from the above-cited "Preface" that the purpose of PennDOT's *Project Level Environmental Justice Guidance* manual is to help its users ensure that they are in compliance with federal law as it relates to environmental justice analyses.  It thus bears repeating that the Federal Highway Administration officially approved the McBride Viaduct environmental justice report on August 1, 2013.  A.A. Report at 30.  In light of these facts, no plausible inference can be drawn from the Complaint that the Defendants' reliance on L.R. Kimball's Environmental Justice Report is indicative of intentional race-based or national-origin-based discrimination.

Plaintiffs' allegations of disparate treatment similarly fail to support an inference of intentional discrimination when considered in the context of the Rule 12(b)(6) record.  For

purposes of Title VI, discriminatory intent can be inferred if the plaintiff alleges that the defendant treated other similarly situated individuals outside of the protected group more favorably. *See, e.g., Osei v. La Salle Univ.*, 493 F. App'x 292, 296 (3d Cir. 2012); *Danihel v. Office of the President of the United States*, Civil Action No. 14-1330, 2014 WL 4384071, at 5 (E.D. Pa. Sept. 3, 2014). Comparators must be "similarly situated" to the plaintiff in "all relevant respects." *See Houston v. Easton Area Sch. Dist.*, 355 F. App'x 651, 654 (3d Cir. 2009) (discussing intentional race-based discrimination in the context of a Title VII employment case); *Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, No. CV 3:11-617, 2018 WL 3756711, at *11 (M.D. Pa. Aug. 8, 2018) (discussing intentional discrimination in the context of an Equal Protection claim). In Subsection "D" of the Complaint, Plaintiffs aver that the City utilized federal funding to replace at least two bridges located in majority white communities within the City of Erie – specifically, the Norman Way Bridge and the Millcreek Drift Catcher Zoo Train Bridge. Compl. ¶¶61, 62, 63, 65. Plaintiffs state that "[b]oth the Norman Way Bridge and the Millcreek Drift Catcher Erie Zoo Train Bridge projects are Defendant City owned bridges and were completed under the supervision and pursuant to Defendant PennDOT guidelines and regulations, and were never scheduled for demolition." *Id.* ¶65. Plaintiffs further claim that "[f]ederal transportation funding was spent to realign West 38th Street and Glenwood Park Avenue between Sassafras and Cherry Streets in or about 2014 in a majority white neighborhood." *Id.* ¶64. Plaintiffs contrast this treatment with: (a) the scheduled demolition of the McBride Viaduct and (b) the demolition of the Division Street railroad underpass, which occurred in 2016 in connection with the City's Metropolitan Transit Authority garage and parking lot construction project. *Id.* ¶67.

Absent from the Complaint is any averment that the construction projects situated in allegedly white communities are otherwise similarly situated to the McBride Viaduct project. Indeed, as Plaintiffs acknowledge in their Complaint, the McBride Viaduct is a 1170-foot structure – the length of nearly four football fields. Compl. ¶30. According to L.R. Kimball, the bridge requires 23 spans "to accommodate business activity and the railroad underneath," and "[r]eplacing the bridge requires excavating and rebuilding all the spans." A.A. Report at 121. As is evident from the Alternative Analysis Report, L.R. Kimball recommended demolition of the Viaduct only after undertaking a detailed cost/benefit analysis that considered a host of engineering and environmental factors that were unique to the Viaduct and the surrounding area. The Complaint, however, lacks any factual content to suggest that the comparator projects in allegedly white communities presented the same kinds of issues or considerations that ostensibly drove L.R. Kimball's recommendation. Nor are there any allegations to suggest that the City ignored or overrode recommendations that the comparator bridges in allegedly white communities be demolished. In short, without some factual content to suggest that similar considerations were at play when the Defendants approved the refurbishment of the comparator bridges or roadways, the Complaint cannot support a plausible inference that the Defendants were motivated by racial considerations when they approved the demolition of the McBride Viaduct.

Finally, the Court is not persuaded that Plaintiffs have pled a "pattern of intentional discrimination" that can sustain their §601 claim. As part of the Defendants' alleged pattern of intentional racial discrimination, Plaintiffs aver that two "compensatory measures" that had originally been proposed for the benefit of bikers and pedestrians in 2014 were later omitted from project documents that were distributed by an unidentified PennDOT official three years

later.  Compl. ¶¶43-44.  Though Plaintiffs complain that the changes were made "without prior public notice or discussion at a public hearing," *id*. ¶45, the mere fact that certain aspects of construction plans changed over time without formal notice to the public is not indicative of discriminatory motive.

Plaintiffs further allege, as part of the pattern of discrimination, that the City Defendants regularly maintained and cleaned bridges in majority white neighborhoods while failing to do the same in predominantly black communities.  Compl. ¶¶46-47.  The Complaint does not offer any factual content to support this "naked assertion," *Iqbal,* 556 U.S. at 678, and the only other reference to bridges in white communities concerns the previously discussed Norman Way Bridge and the Millcreek Drift Catcher Erie Zoo Train Bridge.  For the reasons stated, Plaintiffs have not alleged facts that suggest these supposed comparator bridges are otherwise similar to the Viaduct in all relevant respects; therefore, one cannot plausibly infer from the Complaint that the City's actions relative to the McBride Viaduct were motivated by race.

Plaintiffs also alludes to a remark that the City's engineer allegedly made in 2018 to the effect that he had "been planning to demolish the McBride Viaduct for over a decade." Compl. ¶48.  No factual content is offered that would suggest a nexus between this individual and the relevant decision-makers for the City or PennDOT.  Moreover, even if Plaintiffs' allegation about the engineer is credited, his statement in no way implies that his desire to demolish the Viaduct was the product of discriminatory intent.

Plaintiffs' Title VI claims are even more tenuous as they relate to Defendant PA PUC. The Complaint's only allegations concern the Commission's approval of the City's demolition plans, as expressed in its February 17, 2017 Secretarial Letter, its July 18, 2017 denial of Trott's petition for reconsideration, and its Secretarial Letter of December 20, 2017.  Although Plaintiffs

generally characterize the Commission's decision-making as hurried and predetermined, nothing in the Complaint lends any support to an inference that the PA PUC acted with a racially discriminatory intent. Nor does the Complaint plausibly establish the Commission's deliberate indifference toward a third party's intentional discrimination. For reasons already discussed, no plausible inference of intentional discrimination on the part of the City or PennDOT has been stated.

Based upon all of the foregoing considerations, the Court finds that, despite its length, the Complaint lacks sufficient factual content to support a claim of intentional race-based or national origin-based discrimination under §601. Accordingly, the motions to dismiss will be granted insofar as they relate to Count I.

### Count II of the Complaint

Section 602 of Title VI empowers "[e]ach Federal department and agency" to "effectuate the provisions of section [601] . . . by issuing rules, regulations, or orders of general applicability" relative to federally assisted programs or activities. 42 U.S.C. §2000d-1. Consistent with this provision, the U.S. Department of Transportation ("DOT") has promulgated regulations to effectuate the provisions of Title VI in relation to programs or activities funded by the DOT. *See* 49 C.F.R. §21.1 *et seq.* As interpreted by Plaintiffs, these regulations "specifically prohibit a recipient of [federal] financial assistance from using criteria or methods of administering its program which have the effect of subjecting individuals to discrimination because of their race, color, or national origin." Compl. ¶168 (citing 49 C.F.R. §21.7).

In Count II of the Complaint, Plaintiffs assert that Defendants violated the administrative regulations enacted pursuant to §602 by approving the destruction of the McBride Viaduct. Plaintiff's aver that the Viaduct's demolition will have a discriminatory effect on African-

American and Hispanic residents of the McBride Viaduct community in terms of pollution, quality of life, property conditions, real estate values, and self-esteem. Compl. ¶169(a)-(e). More broadly, Plaintiffs allege that the State Defendants have violated the regulations by permitting a "significantly greater proportion of discriminatory transportation projects" in minority communities, "creating discriminatory effects on persons on the basis of their race, color, and national origin." *Id.* ¶170. In addition, Plaintiffs aver that the State Defendants violated federal regulations by "using criteria and methods of administering" the project that "have the effect of" discriminating against Plaintiffs on the basis of race, color and national origin. *Id.* ¶171(a)-(f); *see also id.* ¶168 (citing 49 CFR §21.7).

Defendants move to dismiss Count II on the basis that no private right of action exists to enforce the regulations enacted under §602.[13] This argument is well-taken. In *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court discussed three aspects of Title VI that "must be taken as given," *id.* at 279, *to wit:* (1) private individuals may sue to enforce Section 601 of Title VI and obtain both injunctive relief and damages; (2) Section 601 prohibits only intentional discrimination; and (3) regulations promulgated pursuant to Section 602 validly may proscribe disparate impact discrimination even though it is permissible under Section 601. *See id.* at 279-82; *S. Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*, 274 F.3d 771, 778 (3d Cir. 2001). The Court went on to hold that no private right of action exists to enforce regulations promulgated under Section 602. *Alexander,* 532 U.S. at 293. In *South Camden Citizens in Action v. New Jersey Department of Environmental Protection*, 274 F.3d 771, F.3d791 (3d Cir.

---

[13] Although Plaintiffs deny that they are pursuing a disparate impact theory of discrimination in their memorandum opposing the City Defendants' motion, *see* ECF 27 at 2 n.1, Count II of the Complaint appears to assert a disparate impact claim. To the extent Plaintiffs are abandoning the claim in Count II, dismissal is appropriate on that alternative basis.

2001), the Third Circuit Court of Appeals further clarified that the regulations promulgated under Section 602 do not create rights enforceable under 42 U.S.C. §1983. Accordingly, as Plaintiffs lack any private right to enforce the administrative regulations published under 49 C.F.R. Subtitle A, Part 21, their claims in Count II must be dismissed.

*Count III of the Complaint*

In Count III of the Complaint, Plaintiffs assert claims against all of the named Defendants under 42 U.S.C. §1983[14] for the alleged violations of their rights under the Equal Protection Clause of the Fourteenth Amendment. *See* U.S. CONST. amend. XIV, §1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). Section 1983 does not by itself confer substantive rights, but rather, provides a remedy for redress when a federally protected right has been violated. *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985) (citation omitted). In order to state a cognizable claim under §1983, "a plaintiff must demonstrate that the defendant, acting under color of law, deprived him of a right secured by the Constitution or the laws of the United States." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).

## 1. Eleventh Amendment Immunity

As an initial matter, the Court must address the State Defendants' argument that they are protected by Eleventh Amendment immunity. "Absent a state's consent, the [E]leventh [A]mendment bars a civil rights suit in federal court that names the state as a defendant, even a claim seeking injunctive relief." *Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981) (citing *Alabama v. Pugh*, 438 U.S. 781 (1978) (per curiam)). This bar "extends to suits against

---

[14] Section 1983 provides, in relevant part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen ... or any other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...."

departments or agencies of the state having no existence apart from the state." *Id.* (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). A state has Eleventh Amendment immunity unless the state consents to the suit or Congress has abrogated its immunity for the claims at issue. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984).[15]

In this case, neither exception to immunity applies, because "Congress did not specifically abrogate the states' Eleventh Amendment immunity in enacting §1983 . . . , and Pennsylvania has not consented to be sued in federal court." *Lyman v. Phila, Court of Common Pleas Domestic Relations Div.*, No. 17-2667, --- F. App'x ---, 2018 WL 4566270, at *4 n.4 (3d Cir. Sept. 24, 2018) (citing *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 64 (1989), and 1 Pa. Cons. Stat. Ann. § 2310). The only remaining question, then is whether PennDOT and PA PUC are instrumentalities of the Commonwealth for Eleventh Amendment purposes. This determination is made by considering "(1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." *Karns v. Shanahan*, 879 F.3d 504, 513 (3d Cir. 2018) (internal quotation marks and citation omitted). "The party asserting Eleventh Amendment immunity 'bears the burden of proving its applicability.'" *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir. 2010) (quoting *Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995)).

Insofar as PennDOT is concerned, the Court can take judicial notice of the fact that PennDOT is an agency of the Commonwealth. *See* 71 Pa. Stat. §61(a) (including PennDOT among the administrative departments of the Commonwealth of Pennsylvania). The Third

---

[15] A third exception exists where a plaintiff sues a state official in his or her official capacity for prospective injunctive and declaratory relief to end an ongoing violation of federal law. *See Ex Parte Young*, 209 U.S. 123 (1908); *Kentucky v. Graham,* 473 U.S. 159, 167 (1985). Because Plaintiffs have not named any state officials as Defendants, this exception does not apply.

Circuit Court of Appeals and district courts in this circuit have repeatedly held that, as an arm of the Commonwealth, PennDOT enjoys Eleventh Amendment immunity. *See, e.g., Warner v. Pennsylvania,* 569 F. App'x 70, 72 (3d Cir. 2014); *Nails v. Pennsylvania Dep't of Transp.*, 414 F. App'x 452, 454-55 (3d Cir. 2011); *Daye v. Pennsylvania*, 483 F.2d 294 (3d Cir.1973); *Tressler v. Summit Twp.,* No. 3:17-CV-32, 2018 WL 948773, at *3-4 (W.D. Pa. Feb. 16, 2018); *Herrera v. Cumru Twp. Police Dep't*, No. CV 17-4287, 2017 WL 4838759, at *6 (E.D. Pa. Oct. 25, 2017); *Walters v. Pennsylvania State Police*, No. 1:13-CV-2275, 2014 WL 6836938, at *1 n.1 (M.D. Pa. Dec. 3, 2014); *Burnette v. City of Phila.*, No. CIV.A. 13-0288, 2013 WL 1389753, at *4 (E.D. Pa. Apr. 5, 2013). Consequently, Plaintiffs' §1983 claim against PennDOT will be dismissed.

The status of Defendant PA PUC is less clear, however. In *Smart v. Pennsylvania Public Utilities. Commission,* No. CIV. 96-3586, 1996 WL 442618 (E.D. Pa. Aug. 2, 1996), the United States District Court for the Eastern District of Pennsylvania ruled, without elaboration, that, "[b]ecause PUC is an agency under the control of the Commonwealth of Pennsylvania, the Eleventh Amendment bars plaintiff's suit against PUC in federal court." *Id.* at *3. One year later, however, that court reach the contrary conclusion in a different civil action. In *National Railroad Passenger Corp. v. Commonwealth of Pennsylvania Public Utilities Commission,* No. Civ. A. 86-5357, 1997 WL 597963 (E.D. Pa. Sept. 15, 1997), the court conducted a detailed analysis applying the three factors set forth above (*i.e.* whether the payment of a judgment would come from the state, PennDOT's status under state law, and the degree to which PennDOT operates autonomously from the Commonwealth). *See* 1997 WL 597963 at *6-10. Based on the record before it, the court concluded that "the balance" of those factors "is struck against a

finding that the Commission is entitled to be protected by the state's cloak of sovereign immunity." *Id.* at *10.

Here, the record is underdeveloped concerning PA PUC's funding, status, and autonomy. Unlike PennDOT, which is a state agency, PA PUC is an independent commissioner by state law. *See* 71 Pa. Stat. §61(a). Accordingly, because the Eleventh Amendment immunity analysis is generally "fact-intensive," *Karns,* 879 F.3d at 513, and because the State Defendants have made no showing relative to PA PUC's entitlement to Eleventh Amendment immunity, the Court declines to dismiss Plaintiffs' §1983 claims against PA PUC on immunity grounds.

### 2. Legislative Immunity

The Court next considers the City Defendants' argument that Schember and the City Council are entitled to absolute legislative immunity. "Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Baraka v. McGreevey*, 481 F.3d 187, 195–96 (3d Cir. 2007) (quoting *Bogan v. Scott–Harris*, 523 U.S. 44, 54 (1998)). The protection extends not just to legislators, but also to the actions of "public officials outside of the legislative branch when they perform legislative functions." *Id.* A member of a local governing body is cloaked in legislative immunity when the challenged action is both "substantively" and "procedurally" legislative. *Acierno v. Cloutier*, 40 F.3d 597, 610 (3d Cir. 1994). An action is "substantively" legislative, as opposed to administrative, executive or managerial, when it involves "a policy-making or line-drawing decision." *Id.* An action is "procedurally" legislative, when it is "undertaken through established legislative procedures." *Id.* An executive function is considered a legislative act if it is an "integral step[ ] in the legislative process." *Bogan*, 523 U.S. at 55. Notably, absolute legislative immunity is a personal defense that is generally applied only to individual officials who are sued in their personal capacities. *See, e.g., Kijek v. Gober,*

594 F. App'x 70, 71 (3d Cir. 2015) (noting that "legislative immunity is generally not applicable to a municipality") (citing *Carver v. Foerster*, 102 F.3d 96, 101 (3d Cir.1996)); *Almonte v. City of Long Beach*, 478 F.3d 100, 106 (2d Cir. 2007) (immunity, whether absolute or qualified, is a personal defense that is available only when officials are sued in their individual capacities).[16]

In this lawsuit, Plaintiffs have sued the City Council as a body, and no claims have been directed against the council members as individuals. Defendants cite no authority for the proposition that the City Council is *itself* entitled to absolute immunity, and this Court is not aware of such authority. In any event, however, the Court finds that Plaintiffs' claim against the City Council is redundant of their claim against the City, as the Council is the municipality's legislative body.[17] Accordingly, the claim against the City Council in Count III will be dismissed on that basis. *See Spradlin v. Borough of Danville*, No. 02–2237, 2005 WL 3320788, at *1 (M.D. Pa. Dec.7, 2005) ("Because the Borough itself as a named defendant would ultimately be liable for any judgment entered against the Borough Council, the Council is a redundant party to the case.") (citing *Satterfield v. Borough of Schuylkill Haven*, 12 F. Supp. 2d 423, 431 (E.D.Pa.1998)); *Copenhaver v. Borough of Bernville*, No. 02–8398, 2003 WL 26616224, at *5 (E.D. Pa. Jan. 9, 2003) (court dismissing certain claims on the ground that "Plaintiffs' § 1983 claims against the Borough of Bernville Council are redundant, and merely restate claims against the Borough itself.").

---

[16] The Court also notes, however, that the Third Circuit Court of Appeals has held that, in "appropriate cases," legislative immunity can apply to claims for declaratory and injunctive relief against officials in their official capacities. *See Baraka v. McGreevey,* 481 F.3d 187, 202 (3d Cir. 2007) (discussing *Larsen v. Senate of Com. of Pa.*, 152 F.3d 240, 253 (3d Cir. 1998)).

[17] See City of Erie Administrative Code §111.01, published at
http://www.erie.pa.us/Portals/0/Content/Ordinances/Codified%20Ordinances/2017/B-Administrative%20Code.pdf.

With respect to Plaintiffs' §1983 claim against Mayor Schember, the Court notes the factual underpinnings of this claim is unclear because Count III contains only conclusory averments concerning the "Defendants" as a group. *See* Compl. ¶174 ("Defendants have intentionally discriminated against Plaintiffs on the basis of race, color, or national origin, in violation of the Equal Protection clause . . ."); *id.* ¶175 ("As a direct and proximate result of Defendants' actions, the plaintiffs will suffer injuries . . ."); *id.* ¶176 ("In acting as is alleged in this complaint, Defendants acted knowingly, willfully, and maliciously, and with reckless and callous disregard for Plaintiffs' federally protected rights."); *id.* ¶177 ("As a result of Defendants' actions, Plaintiffs have suffered and will continue to suffer extreme hardship and actual and impending irreparable injury . . ."); *id.* ¶179 ("Plaintiffs have no adequate or speedy remedy at law . . .  because Defendants have continued to rely upon a flawed environmental justice study and are proceeding with the *McBride Viaduct Study's* schedule of demolition.").

As best as this Court can discern, there are no averments in the Complaint that are directed specifically at Schember.  Thus, the Court cannot presently make a determination as to whether legislative immunity would apply to his actions.  To the extent Schember is being sued in his personal capacity, the primary defect with Count III is its failure to allege Schember's personal involvement in the alleged wrongdoing.  *See Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted).  Although personal involvement can be shown through allegations of personal direction, or of actual knowledge and acquiescence, such allegations must be made with appropriate particularity. *Id.* (citations omitted).  Here, the Complaint is devoid of any factual content that spells out Schember's precise involvement in the relevant decision-making process.  Alternatively, to the extent Schember is being sued only in his official capacity as Mayor, Plaintiffs' §1983 claim against him is redundant of the claim against the City. *See*

*Melo v. Hafer*, 502 U.S. 21, 25–26, (1991). Accordingly, the Court will dismiss the claim in Count III as it relates to Schember.

### 3. Alleged Equal Protection Violations

In light of the foregoing, only Plaintiffs' §1983 claims against the City and PA PUC remain. A municipality may be liable under §1983 if the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996) (citing *Monell v. Dep't of Social Servs. New York City*, 436 U.S. 658 (1978)). The policy must be the "moving force" behind the alleged constitutional violation. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)

Here, as noted, Plaintiffs have asserted a violation of their equal protection rights predicated on the City's alleged racial discrimination in approving the tear down of the Viaduct. Compl. ¶¶174, 177. To state an equal protection claim for racial discrimination under § 1983, a plaintiff must establish that the actions of the defendants "(1) had a discriminatory effect, and (2) were motivated by a discriminatory purpose." *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002) (citations omitted). To establish a discriminatory effect, a plaintiff must "show that [he] is a member of a protected class and that [he] was treated differently from similarly situated individuals in an unprotected class." *Id*. at 206 (citations omitted). In determining whether Plaintiffs have stated an actionable §1983 equal protection claim based on alleged racial discrimination, the court applies the same standards as are applied in the Title VI context. *See Doe ex rel. Doe v. Lower Merion Sch. Dist*., 665 F.3d 524, 557 (3d Cir. 2011) ("Title VI ... prohibitions against discrimination are coextensive with those of the Equal Protection Clause.").

Construing all of Plaintiffs' well-pled allegations in the light most favorable to them, and consistent with the Rule 12(b)(6) record before the Court, the Court concludes that Plaintiffs have failed to state a valid equal protection claim because, for the reasons previously discussed, they have failed to plead facts that could support a plausible inference of intentional race-based (or national origin-based) discrimination on the part of the City relative to the removal of the McBride Viaduct. In addition, Plaintiffs have failed to plead facts suggesting that the City or its policymakers were deliberately indifferent to intentional discrimination relative to the Viaduct's removal. Although Plaintiffs have pointed to putative comparator projects in white communities, Plaintiffs have failed to plead that those projects were similarly situated to the Viaduct in all relevant respects. At most, Plaintiffs have pled facts that establish that the demolition of the Viaduct will have a disparate impact on a primarily non-white community; however, that is not enough to state a claim for race discrimination claim under either the Equal Protection Clause. *See Doe*, 665 F.3d at 551–52 (3d Cir. 2011) ("[E]ven conscious awareness on the part of the [decisionmaker] that the [policy] will have a racially disparate impact does not invalidate an otherwise valid law, so long as that awareness played no causal role in the adoption of the policy.") (internal quotation mark omitted).

Plaintiffs' equal protection claim is even more tenuous as it relates to the PA PUC. As alleged in the Complaint, PA PUC's only involvement in this case was to approve the City's application for permission to demolish the Viaduct. Plaintiffs fault the PA PUC for not affording them an opportunity to participate in the July 2017 hearing, wherein the PA PUC allegedly reached a predetermined decision to deny Mr. Trott's petition for reconsideration of the Commission's prior approval of the demolition project. Nothing in the record before the Court supports a plausible inference that the PA PUC was motivated by considerations of race or

national origin. Nor can the Court plausibly infer on this record that PA PUC was aware of, and deliberately indifferent to, intentional discrimination on the part of PennDOT and/or the City Defendants.

## V.    Conclusion

Based on the foregoing reasons, the Court concludes that Plaintiffs' Complaint fails to state claims upon which relief can be granted. When a civil rights complaint is dismissed for failure to state a claim, plaintiffs should be granted the opportunity to amend the complaint unless amendment would be inequitable or futile. *See Wilson v. City of Phila.,* 415 F. App'x 434, 437 (3d Cir. Mar. 1, 2011) (citing *Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc*., 482 F.3d 247, 251–52 (3d Cir. 2007)). In this case, the defects that the Court has highlighted appear to be irremediable. Consequently, the Complaint will be dismissed with prejudice, since further amendment would be futile. From a procedural standpoint, the Court notes that this dismissal will afford Plaintiffs an immediate right of appeal and will avoid the expenses that would inevitably be incurred in connection with an injunction hearing including, potentially, counsel fees, expert witness fees, costs of bond (unless waived), and significant delay costs for the City if work on the Viaduct cannot proceed due to the ensuing winter months.

Finally, in reaching its ruling, the Court notes that it is not unsympathetic to the concerns expressed by Plaintiffs who are no doubt sincere in their opposition to removal of the McBride Viaduct. Nevertheless, the Court must be guided in its decision-making at all times by the controlling legal standards that govern this case. Here, for the reasons stated above, the Court is of the view that Plaintiffs' claims are legally insufficient. Accordingly, the claims will be dismissed by entry of an appropriate Order.

Dated: October 29, 2018                                   s/ Susan Paradise Baxter
                                                         SUSAN PARADISE BAXTER
                                                         United States District Judge

cc (via ECF email notification):
       All Counsel of Record